OLE ANDERSON, PLAINTIFF IN ERROR, V. STATE OF NEBRASKA, DEFENDANT IN ERROR.

1. **Criminal Law**: CONFESSIONS. Where a party accused of crime, voluntarily and without inducement of any kind, makes a confession that he committed the offense, and details the facts and circumstances, such confession is admissible in evidence against him, although at the time of making the same he was held in custody.

2. ———: INSANITY. A person, though of weak mind, but with sufficient capacity to distinguish right from wrong in respect to the particular act charged, is accountable for his acts, and the plea of insanity will be unavailing.

3. **Instructions**, *Held*, To be favorable to the plaintiff in error.

ERROR to the district court for Brown county. Tried below before KINKAID, J.

*J. L. Caldwell* and *A. R. Warrick*, for plaintiff in error, cited: 1 Greenleaf on Evidence, Sec. 218. *Walrath v. State*, 8 Neb., 87. Wharton Crim. Ev., Sec. 689, 552. 1 Green. Ev., 254. *McElvoy v. State*, 9 Neb., 165. *Schlencker v. State*, 9 Neb., 300. *Preuit v. People*, 5 Neb., 377. *Simmerman v. State*, 14 Neb., 568. *Craft v. State*, 3 Kas., 450.

*William Leese, Attorney General*, for defendant in error, cited: *Heldt v. State*, 20 Neb., 496. *Ballard v. State*, 19 Neb., 615. Wharton's Crim. Ev., 8th Ed., 673. Maxwell Crim. Pro., 227, note 1. *Johnson v. State*, 10 Tex. (App.), 571. *Russell v. State*, 53 Miss., 367. *Fisher v. State*, 64 Ind., 435.

MAXWELL, J.

The plaintiff in error was indicted for the murder of his wife, in Brown county, and on the trial was found guilty

of murder in the first degree, and was sentenced to be hanged.

The testimony tends to show that in November, 1886, the plaintiff in error and his wife were residing on a farm about six and one-half miles from Bassett, in Brown county ; that for several days prior to the 21st of November of that year the neighbors had failed to notice the appearance of the wife, and on the 21st of November inquiries were made of the plaintiff in error as to her whereabouts, to which he answered that she had gone to Platte or Saunders county. An examination of the well showed it to be filled up with snow nearly to the top—the well being about twelve feet in depth.

This news was carried to Bassett, and a searching party organized, which proceeded to the residence of the plaintiff in error, took him in custody, and commenced to throw the snow out of the well, when the body of the wife was discovered in the well, she having either fallen or been thrown therein with her head downward. Her skull was crushed in at least two places. The body was taken in charge, and the plaintiff in error taken to Bassett and placed under guard.

The testimony on the part of the state consists to a great extent of the alleged confessions of the plaintiff in error. These confessions and the circumstances leading up to them, are detailed by one W. J. Albright, as follows :

Q. You may state whether or not you saw him (the plaintiff in error) on Sunday, the 21st day of November last?

A. Yes, sir, I saw him.

Q. Where ?

A. At his own house.

Q. Under what circumstances did you see him ?

A. We was there with the rest of the boys.

Q. Just state all the circumstances.

A. One of the boys came to town and said that there

was something wrong up at Anderson's house, that his wife had not been seen for some time. We went down there Sunday evening, called around to the house of this Swede, and got him and Linderman, went up to the house and knocked, and the old man asked who was there. Pete Young was the spokesman, and he said, " It's Pete Young." First of all, he asked three times for Anderson to open the door. Then he asked who was there, and they said Pete Young. He said are you sure, and Pete Young said yes, for to open the door. Anderson then opened the door, and Pete Young and Jack Linderman went in, and three or four of us also went in.

Q.   State what you done after going into the house.

A.   We went into the house; Mr. Linderman asked him where his wife was; he said his wife had went East. We asked him when she had gone; he said about a couple of weeks, that she had gone down to Saunders county or Platte county. There was considerable talk about the well business. Some of the boys had been outside. I took a couple of shovels and we went out. We went down some of us and examined the well, and found there was some blood in the snow in the well. We commenced digging down and found clothes, shoes, a pair of spectacles; then the boys seen the form of a foot, and one of the boys reached down and felt of it; I told the boys that was her; she had her stockings on ; they were not sure first that that was her. We got a hold of her and lifted her out. Nothing more was done then, but went up to the house. I believe we told the boys she was there in the well. Some of the boys tied him up, and we took him down to the well and asked him if that was his wife.

Q.   About what time in the night was this ?

A.   Between seven and eight o'clock.

Q.   Did you have any other conversation with him ?

A.   Not until the next morning.

Q.   Did you have a conversation with him on Monday morning ?   (November 22d.)

A. Yes, sir.

Q. State what the conversation was.

Q. Did you on the next morning ask this defendant any questions with reference to this matter ?

A. Yes, sir.

Q. Did he make any answer to your question?

A. Yes, sir.

Q. Did you state to him that morning that it would be better for him to confess, or worse if he did not confess, or words to that effect?

A. No, sir, there was nobody spoke to him until I spoke to him.

Q. Was there any one that made any inducements to him in any way or manner, through hope or fear, to make any statement on that morning ?

Q. You may state Mr. Albright what, if anything, any one did or said to this defendant upon that morning, prior to you asking him this question.

A. There was no one said anything to him but Mr. Linderman.

There is a lengthy cross-examination of this witness set out in the record, which does not change the above testimony, after which the witness testified to the following:

Q. What did you say?

A. I asked Mr. Anderson what caused him to murder his wife.

Q. Do you remember whether these were the exact words?

A. Yes, sir.

Q. This conversation was had sitting upon the bed. What the district attorney is asking you about now, is that correct?

A. Yes, sir.

Q. Anybody else say anything?

A. No, sir.

Q. Now you may state what that conversation was.

A. When I spoke to Mr. Anderson about his wife, he said, "Mr. Albright, there is no use in denying it." He says, "I did kill her." I asked him what his trouble was, and he said it was over a note that was due, and he did not have money to pay it off, and he wanted to sell one of her cows, or one of the boy's, I don't know which, and to pay the note off; and she would not let him. He asked her a couple of times, and he said that she said that if he would ask her again she would hit him with the ax. He said she went to the house and came back, and he spoke to her again, and she stooped, picked up the ax, and he hit her with the water bucket. He went to the stable and watered his stock, and came back and hit her twice more with the bucket while she was laying at the well.

Q. You may state all that was said there at that time.

A. Something else he said, I cannot remember it right.

Q. I believe you stated that he hit her with the water pail.

A. Yes, sir.

Q. Did he say where he hit her?

A. On the head with the bucket.

Q. When you say he said he struck her on the head, did he say anything about what was done?

A. No, he did not.

Q. Now have you stated everything that he said to you that morning?

A. No; there is something else that I have forgotten, or I can't bring it to my mind.

Q. Did he state what he done after he struck her on the head with the pail?

A. He said he went to the stable to water his stock.

Q. Can you recollect anything else he said?

A. When he struck her over the head with the bucket he went to the stable with the water to water his stock, and came back and saw that she was lying by the well;

he struck her twice more with the bucket when she was lying there by the well.

Q. Is that all you can recollect?

A. That is all that I can recollect now that he said.

This witness is corroborated in the principal points in his testimony by two or three other witnesses. Other witnesses, however, testify that the plaintiff in error also stated that after returning from the stable and again striking her, he threw her in the well. There was an attempt on the part of the defendant below to show that violence was threatened or feared by him, hence the confession. There is an utter failure of proof, however, to show that violence was either threatened or intended. The confession is shown to have been made voluntarily and without inducement of any kind, and was properly received as evidence. In addition to this, the plaintiff in error pleaded guilty to a complaint charging him with the murder of his wife, on an examination before a justice of the peace. This confession before the justice, after being admitted in evidence, was withdrawn from the jury for some cause that does not clearly appear. There is other testimony in the record tending to inculpate the plaintiff in error, which need not be referred to.

2d. The plaintiff in error was not a witness in his own behalf, but a large number of witnesses were called on his behalf to prove that he was insane, while an equal number were called on the part of the state to prove that he was of sound mind. There is a direct conflict in the testimony, and the most that can be said of it is, that the evidence on behalf of the plaintiff in error tends to show that he was a man of weak mind and subject to outbursts of passion; while that on behalf of the state shows that he was of sound mind and capable of transacting business. The clear weight of the testimony, however, shows that he was capable of distinguishing right from wrong, and not insane.

In *State v. Nixon*, 32 Kas., 205, the rule is stated as follows: "Where a person at the time of the commission of an alleged crime has sufficient mental capacity to understand the nature and quality of the particular act or acts constituting the crime, and the mental capacity to know whether they are right or wrong, he is generally responsible if he commits such act or acts, whatever may be his capacity in other particulars; but if he does not possess this degree of capacity, then he is not responsible."

In the recent case of *State v. Mowry*, 27 Am. Law Reg., 649–650, the same court approved an instruction that, "If he was laboring under such a defect of reason from disease of the mind as not to know the nature and quality of the act he was doing, or, if he did know it, that (but) he did not know that what he was doing was wrong, then the law does not hold him responsible for his act. On the other hand, if he was capable of understanding what he was doing, and had the power to know that his act was wrong, then the law will hold him criminally responsible for it. If this power of discrimination exists, he will not be exempted from punishment because he may be a person of weak intellect, or one whose moral perceptions are blunted or illy developed, or because his mind may be depressed or distracted from brooding over misfortunes or disappointment, or because he may be wrought up to the most intense mental excitement from sentiments of jealousy, anger, or revenge. The law recognizes no form of insanity, although the mental faculties may be disordered or deranged, which will furnish one immunity from punishment for an act declared by law to be criminal, so long as the person committing the act had the capacity to know what he was doing, and the power to know that his act was wrong."

These cases are in harmony with those decided by this court. *Wright v. People*, 4 Neb., 407. *Hawe v. State*, 11 Neb., 537. In the latter case it is said (p. 538): "The

instruction complained of in effect says to the jury that mere oddity or hypochondria is not insanity, and if the accused at the time of committing the offense was in possession of reason, and was able to discern right from wrong, he would be responsible for his actions."

In *Hart v. State*, 14 Neb., 573, it was held that, "if one charged with crime have the mental capacity to distinguish right from wrong in respect to the particular act charged, he is responsible.

All that was testified to by the witnesses for the plaintiff in error may be true, and still it fails to show that he was unable to distinguish right from wrong in regard to killing his wife.

The jury having passed upon this testimony, and found, as it must have done, that the plaintiff in error was sane, and the weight of testimony being in support of the verdict, that question need not be further considered.

3d. Objections are made to the instructions. The instructions cover a number of pages and are too long to copy into this opinion, but an examination of them shows that they were drawn with care, and that they are favorable to the accused. On the whole case there is no material error in the proceedings; but as there is not sufficient proof of premeditation, the judgment, upon the proper petition being filed, will be modified.

JUDGMENT ACCORDINGLY.

THE other judges concur.